Good morning. My name is Sylvia Baez. I represent Mr. Flores-Blanco. I can't hear you. Would you speak louder, please? Sure. My name is Sylvia Baez. I represent Mr. Flores-Blanco and his appeal. Mr. Flores-Blanco lived about 60 feet from the border for 20 years prior to this case being – and there were people going – people who were undocumented around his neighborhood all the time. And in this particular case, on the night of his arrest, he was in his backyard, and he and the person who was arrested as the co-defendant in this case were seen in Mr. Flores' backyard, and the co-defendant would leave the backyard and go closer to the border and come back and forth. The co-defendant in this case was willing to testify that Mr. Flores-Blanco didn't have anything to do with what the co-defendant was doing in this case. He eventually pled guilty to encouraging the unlawful entry of the undocumented person that was arrested on the night of their arrest, and he was willing to do that. But in this case – Well, you say that, but, of course, he said he pleaded the Fifth when he was asked whether – Well, because he said – he also testified right before that, that he – that my client didn't have anything to do with it. Yeah, he said that, but I think – I mean, what the court was getting at is you can testify to that, and you'll be subject to cross-examination and so on, and then he said, well, I plead the Fifth. Right. But I believe that the court also made some comments to him prior to that about how he wasn't going to compel immunity and there's no evidence that – no evidence that the evidence was exculpatory. And I think that he, in addition to – the government didn't do anything malevolent in this case, and I'll start with that. But I think that the judge and the government's refusal to grant the co-defendant immunity intimidated the co-defendant into not testifying. The judge said – started out by saying in the co-defendant's presence, you're trying to inform me that you're going to refuse to testify, and then he said, you're trying to inform me that you're going to refuse to testify. On that basis, you're going to assert your Fifth Amendment right. That's what you're here to do, aren't you? And then I requested that the government give the co-defendant immunity, and the court said, I don't think he has any exculpatory evidence to offer. I assume that. Does the government want to grant him immunity? And the government said no. And then the court said, I won't grant him immunity. He's facing undismissed charges. I can't grant him immunity. Do you have an offer of proof? And then I said, well, he was willing to offer exculpatory evidence. And then he said, yes, he didn't have anything to do with it. But then he changed his mind because I think the court rather forcefully said, you have undismissed charges, you know, it's up to you if you want to testify, but you still have undismissed charges. So I think that the co-defendant was intimidated into not testifying, and the government's act of saying, well, you know, there's nothing in his plea agreement that precludes him from testifying, and we agree with that, you know. The testimony itself is not a violation of the plea agreement, but we're not saying anything about the context of the testimony, about whether or not we would think it's a violation. You say he was intimidated. It sounds as if you're saying that he's intimidated by the judge. Yes, by the judge. And I'm saying that the government's refusal in the fact of the exculpatory evidence that the co-defendant wanted to offer initially until he was intimidated into not testifying. What was the conduct of the government? Your argument, I guess, is that it was error to deny the co-defendant his immunity. That's usually premised on misconduct by the government or some action by the government. Well, I understand that. But I'm saying the action of the government was in the face of knowing that there's exculpatory evidence saying, no, I'm not going to grant you immunity, even if you have exculpatory evidence. And that exculpatory evidence, I think, would have gone a long way in front of the jury to show that, you know, that my client wasn't involved in what was going on there. And what was the showing of the exculpatory evidence? What was the offer of proof? Other than the co-defendant saying he didn't do it. I mean, that's not particularly helpful. Was there anything specific about he was in a different place, a different time, other issues? Well, I mean, during the trial, of course, and before that, it was known that Mr. Flores lived right there at the border. And the fact that the co-defendant was the one that was seen going in and out of his backyard and going to and from the border and saying, you know, that it wasn't his, that it wasn't my client's doing, that my client wasn't involved in what he was doing, because he was the one that was seen going back and forth across the border. And his saying that he didn't do it, I think, is exculpatory evidence. I think it would have gone a long way to – I mean, I didn't say what specifically the co-defendant would testify to, but him coming out and saying, well, he didn't do it, he said guilty already, and he didn't do it, I think is pretty exculpatory, even though it's not very detailed at that particular moment. Are you going to address the – whether he can be guilty of this particular offense? The sufficiency? Yes. And that was my next argument. I'd like to hear some of that. Okay. Well, in this particular case, as the Court knows, in the United States v. Lopez, the Court defined what a bringing-in offense is and when it ends. And the bringing-in offense would end at the time that the people who were in charge of smuggling the person across the border, when the person actually landed in the United States. And my position is that the bringing-in offense landed at the time that the person jumped over the border. If the evidence would be sufficient for the jury to find that he was aiding the people coming across by signals or some other way, wouldn't that be a participation in the bringing-in? Well, I think that the case law in this circuit is that there has to be more evidence. There has to be some kind of information that the person was involved in the actual planning and communicating with the people who were the actual smugglers. And some kind of, you know, anticipatory planning that I think that the government would have had to do. Well, there's evidence that the person came across the fence and I was told to go to this place and there would be a guy there to meet me. And that was the place where the defendant was until he saw the agent and left. Couldn't a jury find that? Well, there had to be a prearrangement if that's what the deal was. Well, there was no evidence of who my client was talking to on the phone. There was no other evidence of either by statement or the material witness. Even the material witness said, I didn't know who was going to bring me across the border. My friend made all the arrangements. I was just told to jump over the fence and run towards somebody who was on the other side of the border. I was supposed to run to the other side of the border. Now, you know, there was some contradictory evidence about what my client was wearing, what he wasn't wearing. And even the person who, the officer who arrested my client said that he was wearing all black and the person across the border, the undocumented person said that he saw somebody but he never really saw anybody waving at him and that the person that he saw across the border was wearing just black clothing, which the evidence at trial bore out that the co-defendant was just wearing black clothing, black clothing, black shirt and black pants. So there was evidence that it was maybe the co-defendant who was the one that was the undocumented person across the border. So, you know, I would think, I would argue that there had to be more than my client's presence there for a jury to find. There had to be some kind of evidence of planning and there just wasn't any evidence of that in this case. And, you know, the officers testified that the co-defendant was at the border, that the co-defendant was the one that was actually, looked like he was talking to people across the border because they could see through the fence that there was somebody across on the Mexican side of the border. So my position is that there wasn't enough for him to be convicted of the bringing in and for financial gain and the minimum mandatory that he was charged with here. In terms of the argument regarding the 404B evidence, evidence that he was previously detained by the border patrol, I think that that particular evidence really put the whole case over the edge because in terms of whether or not the, my client was actually the one that was involved in trying to encourage the undocumented person to come across the border, there was evidence that maybe they didn't identify the right person and maybe it was a mistake that they even arrested my client. But there was this evidence that he was detained on two previous occasions. But isn't that relevant to the issue of knowledge and planning? Well, I don't think so. My client's defense was not that he didn't know something was going on. My client's defense was just that even though there are, and he sees people every day coming over the border because he lives so close to the border, his defense was maybe the co-defendant was involved in something, but I didn't have anything to do with it that night. He never said that he didn't have any knowledge of what was going on. But in this case, there are several reasons why he shouldn't have been brought in. One is there was really actually no evidence that my client was actually involved. He was present on two prior occasions when the Border Patrol detained him. One occasion, one of the Border Patrol people saw some people come through the fence and run across the border, run through my client's backyard, and then they saw my client in the backyard with these two people. But he never, there was no evidence that he was taking them in the house, and there was no evidence that he was doing anything other than probably telling them, get out of my yard, because the information in that event was that the Border Patrol came up to the front of his yard, those people ran into the back of his yard, the Border Patrol came up to the front of the yard, and that's where he questioned my client and learned that the two people behind him were undocumented people. But I don't, I don't, I disputed that even, that he was even involved in that case. And the other case, the Border Patrol agents were listening to somebody, it sounded like somebody was cutting through the international border fence and saw some undocumented people running into another house in the neighborhood, not my client's house in the neighborhood, but my client was in the house when those people ran in there. So first of all, I don't think that there was enough proof that he was actually involved on those two prior occasions. And then I don't think that there was any similarity in that, because he was never involved in bringing people and hiding them in his house, which was the government's idea in this case. That was what was ultimately going to happen. There was never any evidence of Mr. Flores Blanco doing anything like that here. I'm not sure if I have more time, but I would like to reserve that. You've just got 24 seconds left, I'm sorry. Oh, okay. Well, I can talk a lot in 24 seconds. Okay, thank you very much. We'll hear from the government. May it please the Court. David Leschner for the United States. I would like to begin, with the Court's permission, by addressing the issue of the district court's refusal to compel the government to grant immunity to the co-defendant Fernandez. The legal standard for this inquiry is established in United States v. Straub, and it is a two-part inquiry. Either the government must have intentionally caused the witness to take the Fifth Amendment for the purpose of distorting the fact-finding process, or the government must have declined to grant immunity to the prospective witness while granting immunity to other individuals whose testimony the prospective witness would have directly contradicted. Neither scenario exists in this case. Taking them in reverse order, the government did not grant immunity to any witness in this case. And second, the record, and frankly, I appreciate the concession of defense counsel, even an oral argument, the government in this case did nothing to cause Mr. Fernandez to invoke his right against self-incrimination. That is clear at supplemental excerpt of record, pages 15 to 17. And there is no allegation of that. There was none in the district court. There is none on appeal. To the contrary, this now happened on Tuesday morning, the first day. Was that supplemental record concerned with the – there was kind of a separate conference or hearing with the court where – to make clear that the government did not view this as a violation of the plea agreement? Correct. And I was – there are two episodes where this happened. The first, on the first morning of trial, Mr. Flores' counsel requested that Defendant Fernandez be brought out, and that's at pages 15 to 17 of the SCR, where the colloquy between the court and Mr. Fernandez took place. On – that was Tuesday morning. On Thursday morning, the last day of trial, the court ordered that Mr. Fernandez be brought from the detention facility, although he was never actually brought into the courtroom that morning because the court wanted to clarify that in the court's view that there was nothing in Mr. Fernandez's plea agreement that would prevent him from testifying. And at SCR 283 and 284, I, on behalf of the government, clarified that, yes, we agreed with that view. There was nothing in the – Mr. Fernandez's plea agreement that would have prohibited him from testifying for Mr. Flores. I would respectfully disagree with opposing counsel that the district court did anything improper here. To the contrary, if you look at SCR 16 – page 16, there was no intimidation of Mr. Fernandez. What happened was, before Mr. Fernandez came out – Well, she said that the judge intimidated her. Right. That's what – I'm sorry. That's what I meant to say. If I – if I misspoke, I apologize. I was speaking of Judge Whalen. I respectfully disagree with that. As you – if you look at pages 15 to 17 of the SCR, Mr. Fernandez, the co-defendant's counsel, informed the court, outside the presence of Mr. Fernandez – he was still in the holding area, outside the courtroom – that Mr. Fernandez's counsel informed the district court, my client has been asked to be brought here by Ms. Baez. He is going to assert his Fifth Amendment rights. On page 16 of the SCR, Mr. Fernandez is brought out into the courtroom, and Judge Whalen says to him, your attorney informed me you are going to refuse to testify on the basis you are going to assert your Fifth Amendment rights against self-incrimination. That's why you're here. That's why you've been brought into the courtroom. Is that your intent to do that, sir? Answer, yeah. And it continues on from there. But the record, I believe, refutes any contention that the district court intimidated Mr. Fernandez in any matter. His counsel had informed the court, obviously after conferring with Mr. Fernandez, that he was going to assert his Fifth Amendment rights. When asked by the court, under oath, outside the presence of the jury, is that your intent? The answer was yes. Unless the court has further questions, I would like to briefly address Your Honor's questions about the brings to offense. The facts and circumstances of this case are materially distinguishable from United States v. Lopez. As the court, I'm sure, is aware, that en banc decision dealt with a stateside transporter of undocumented aliens. And the reason why the evidence was insufficient in that case to sustain a case for aiding and abetting was based on the facts of the case, in that once the aliens, the group of aliens, had crossed on foot into the United States, they were led to a pickup location, at which point their foot guide left them. An initial driver was sent to pick them up, but that driver was arrested. And approximately one day and one night after the initial foot guide had So there was insufficient evidence in that case to show that Ms. Lopez aided or assisted in the brings to offense before it terminated, because the law of this circuit before then was that the offense continues until the aliens reach their ultimate destination. Of course, Lopez announced a new test, and the evidence was insufficient in that case under the new test. Here there is the explicit extraterritorial connection, to use the words of this court in the United States versus Fernandez-Orellana, between the conduct of both Fernandez and Flores and the brings to offense. In fact, the evidence before the jury was that every relevant action of both Mr. Fernandez and Mr. Flores occurred before the alien, Mr. Portillo Mendoza, was investigated. All of Mr. Fernandez's trips from the 806 2nd Street backyard to that concealed location directly across the street from the border occurred between approximately 8 p.m. and 1240 a.m. And on that last occasion when Mr. Fernandez walked to his concealed location, he was standing, or crouching I should say, excuse me, looking directly south toward the border in this area. There are photographs in the record that the border fence is made of steel posts and you can easily see through the border fence. And Agent Carter was able to see Mr. Fernandez on the phone looking directly south at two individuals and waving them to the east. So at that point, clearly Mr. Portillo Mendoza has not crossed into the United States. Mr. Fernandez then says into his cell phone as he's leaving that location, we're ready. Now, now. We're ready. And at that point, Agent Sedano, who is in a concealed location, he can observe the backyard, sees Mr. Flores leave the backyard, crouch down, and I believe the page is SCR 287 if I'm correct, which shows you Mr. Flores's view directly across the street from the border. And Agent Sedano observes Mr. Flores crouch down. He can see the two individuals that Fernandez had waved eastbound, still in Mexico, walking eastbound. And Mr. Flores is crouched down. He makes a waving motion and says in the Spanish language, I'm here. At that point, of course, the material witness is still in Mexico. Mr. Flores sees Agent Sedano standing approximately 10 to 20 feet away, understandably as spooked by that, and takes off. Approximately a few minutes later, agents conducting video surveillance with the cameras along the border call out an individual is coming over the fence. Agent Alfaro, who is in his Border Patrol vehicle, sees the alien coming over the fence through his rearview mirrors. The alien runs north, but because Mr. Flores is gone, there's nowhere for that alien to go. He's apprehended within minutes by Agent Alfaro. So all of the relevant conduct in this case happened before Mr. Portillo crossed the border. So regardless whether the brinks, regardless when, I should say, the brinks to a fence ends under Lopez, assuming it ends the moment Mr. Portillo's feet touch the ground in the United States on the north side of the fence, all of the relevant conduct necessary to sustain a conviction for aiding and abetting has already happened. And for that reason, Lopez, Hernandez, or Ayanna do not compel a reversal on the brinks to a fence. Very briefly, with respect to the 404B evidence, the district court did not abuse its discretion in admitting these two prior apprehensions of Mr. Flores, both of which occurred within two years of the instant offense. What was the legitimate purpose of the 404B evidence? The purpose for which the 404B evidence was offered, Your Honor, was to establish Mr. Flores' knowledge of the alien smuggling venture and as well his intent to facilitate that venture. We believed, of course, that we had very strong evidence based on the eyewitness observations of Agents Sedano and Carter. At the same time, the defense was, as Ms. Bison informed Your Honors, he was just hanging out in his backyard. Hernandez was doing the bad stuff. My guy was simply an innocent bystander. And that evidence was relevant not to establish merely propensity, but to establish both Mr. Flores' knowledge of the venture and his intent to facilitate it, which was relevant for all three of the offenses charged, the conspiracy that brings to and the inducing and encouraging offense. And the district court, I should say, counsels arguments as to, well, maybe the agents couldn't identify Mr. Flores as actually helping the aliens into the house on the first offense. These type of arguments go to the weight that the jury is to give the evidence. They are not arguments that establish that there is some sort of danger of unfair prejudice that substantially outweighs the probative value under Rule 403. In fact, with respect to the January 2006 offense, both of the agents, Agent Yo and Agent Diaz, testified that when they were driving along First Street and they observed two suspected aliens climb over the border fence and jump onto First Street, Agent Yo jumped out of the car and ran after them. Those aliens ran north across First Street through the first row of houses on First Street, turned left in the alley, and immediately jumped into the backyard of 806 Second Street. There's about a five to six foot fence. Agent Yo is about six foot six. He was able to observe over the backyard fence and he sees Mr. Flores Blanco leading the two aliens, suspected aliens I should say at that point, up the side of the house. That is confirmed by Agent Diaz who responds in the vehicle to the front of the residence and sees Mr. Flores, again, leading the aliens along the side of the house. It was our theory, of course, that Mr. Flores Blanco was engaged in knowingly smuggling those aliens. The defense certainly was free to make the argument as to exactly the extent of the probative value, but none of that would establish in our view that the district court would have used its discretion in admitting the evidence. Unless the court has specific questions for me, I would submit on that. No questions. Thank you, Your Honor. Ms. Bayouzi, you have 24 seconds as I recall. Well, there was evidence in this case with regard to the sufficiency of the evidence that the border patrol agent who was surveilling my client may have been mistaken about a lot of different facts, and it was my argument that he was mistaken about what he said he saw my client doing when he indicated that my client was between those houses crouching down. And I think that, you know, I think that Mr. Flores would have had a decent argument that the agent was just not accurate about what he said he saw Mr. Flores doing because he was wrong about what he was wearing. He was wrong about the timing. He – there was – in other words, there was evidence to impeach the agent with regard to what he said he saw my client doing. And – Thank you very much, counsel. The case just argued will be submitted for decision, and the Court will adjourn. Thank you. The hearing is adjourned. All witnesses before the Sonago Court may please close the hearing. Thank you. You shall now depart from this court stand. Adjourned. Thank you.
judges: Canby, Hall, O'Scannlain